UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

v.                                          NO. 14-022

PETER M. HOFFMAN,                           SECTION "F"
MICHAEL P. ARATA,
SUSAN HOFFMAN

ORDER AND REASONS

Before the Court is Michael Arata's motion to dismiss Counts 22 through 25 of the second superseding indictment. For the reasons that follow, the motion is DENIED without prejudice.

**Background**

Peter and Susan Hoffman and Michael Arata were partners in various movie-related business ventures.  One such venture was the purchase and renovation of a dilapidated mansion on Esplanade Avenue in New Orleans, which they turned into a post-production film editing facility.  This federal white collar criminal case arises from the government's allegations that -- in connection with the renovation project -- the Hoffmans and Mr. Arata (through companies they owned) allegedly committed, aided and abetted, and conspired to commit, mail and wire fraud by submitting false expense reports in order to deceive the State of Louisiana into issuing state tax credits that they had not actually earned and

were not entitled to receive.[1]  Mr. Arata, alone, is also charged with making false statements to federal agents.

The facts giving rise to this criminal case are more completely summarized in the second superseding indictment and in this Court's Order and Reasons dated July 18, 2014. United States v. Hoffman, No. 14-22, 2014 WL 3589563, at *1-3 (E.D.La. July 18, 2014).  The background facts most pertinent to the resolution of the present motion are summarized here.

In renovating the property at 807 Esplanade Avenue, Peter Hoffman,[2] Susan Hoffman,[3] and Michael Arata,[4] through their

---

[1]The backdrop of this federal criminal case is a Louisiana state law tax credit program, in which individuals and businesses that applied to the State for film infrastructure tax credits were entitled to receive an amount equal to 40% of their qualified and audited film infrastructure expenditures.  Once certified, the applicants could then sell the certification to local businesses and individuals, who would then use the tax credit certifications to offset taxes that the businesses and individuals would otherwise have owed to the State of Louisiana.

[2]Peter M. Hoffman, the government alleges, was the CEO of Seven Arts Entertainment, Inc., a company involved in the motion picture and entertainment industry in California.  Mr. Hoffman was also an attorney and served as a executive in numerous financial and tax-preferred financings for over 25 years. He also owned, operated, and controlled numerous companies affiliated with Seven Arts Entertainment, Inc.

[3]Susan Hoffman, the government alleges, was a California film producer who relocated to New Orleans.  Susan Hoffman also owned and operated several companies, including Leeway Properties, New Moon Pictures, LLC, and Seven Arts Pictures Louisiana, LLC.

[4]Michael P. Arata, it is alleged, was also a Louisiana attorney and businessman who owned and operated companies involved in the movie and entertainment industry, including Seven Arts Pictures Louisiana, LLC, Voodoo Production Services, LLC, Voodoo

respective companies, availed themselves of the Louisiana film infrastructure tax credit program. They submitted three applications and supporting documents to the State for tax credits. As statutorily required, the defendants first submitted the 807 Esplanade expenditures to auditors for verification.  To verify the expenditures, the auditors requested proof of payment such as invoices, bank transfers, bank statements, and other corporate financial records.  Based on this information, the auditors created audit reports detailing the defendants' claimed expenditures on 807 Esplanade.   These audit reports were submitted as part of the February 26, 2009, January 20, 2010, and July 3, 2012 submissions to the State for film infrastructure tax credits.

On June 19, 2009 the State issued $1,132,480.80 in tax credits to Seven Arts Production Louisiana, LLC as a result of the first application, the February 26, 2009 submission.  Mr. Arata paid cash to the partnership for these tax credits, at a discounted price, through his company LEAP Film Fund II, LLC, and then sold the tax credits to local businesses and individuals for profit.  (The State did not issue tax credits based on the January 20, 2010 and July 3, 2012 applications).

On January 27, 2014 Mr. Arata, with his counsel present, made statements to a Special Agent of the FBI pursuant to a written

---

Studios, LLC, and LEAP Film Fund II, LLC, which purchased, sold and brokered Louisiana film tax credits.

proffer agreement with the government.  The government bargained for "completely truthful" information "with no material misstatements or omissions of fact" so that it could "assess the value, extent, and truthfulness of [Mr. Arata's] information [about the criminal liability of [Mr. Arata] and others" in order to "ultimately reach a decision concerning [Mr. Arata's] cooperation." In exchange, Mr. Arata received assurances from the government that "statements or information contained in [Mr. Arata's] proffer may not be used in the government's case-in-chief against [Mr. Arata] should a trial be held."[5]

Shortly thereafter, on February 6, 2014 a grand jury returned a six-count Indictment, charging Peter Hoffman and Michael Arata with conspiracy (Count 1), as well as aiding and abetting, and actually committing wire fraud (Counts 2 - 6), in violation of 18 U.S.C. §§§ 371, 2, 1343.  After first superseding on April 3, 2014,[6] the government filed a 25-count second superseding

---

[5]Although the government agreed not to directly use Mr. Arata's proffer statements or proffer "in the government's case-in-chief", the parties agreed that "[t]he government may make derivative use of...any statements or information provided by [the] proffer."

[6]This Superseding Indictment filed on April 3, 2014 charged Susan Hoffman for the first time, and added additional charges against the other defendants: conspiracy (Count 1), wire fraud and aiding and abetting against Peter Hoffman and Michael Arata (Counts 2 - 5), wire fraud and aiding and abetting against all three defendants (Counts 6 - 17), mail fraud and aiding and abetting against all three defendants (Count 18), and false statements against Michael Arata only (Counts 19 - 22).

4

indictment on May 15, 2014, charging the Hoffmans and Mr. Arata with conspiring to commit, committing, and aiding and abetting, wire and mail fraud, in violation of 18 U.S.C. §§§§ 371, 1343, 1341, and 2, and also charging Mr. Arata with making false statements to federal agents.[7]  It is the false statement charges, Counts 22 through 25, that are the targets of this motion.  (At no time did the government seek judicial approval in advance of charging Arata with making false statements).  The false statement counts -- Counts 22 through 25 -- charge:

**COUNTS 22 - 25**
**(False Statements)**

On or about January 27, 2014, in the Eastern District of Louisiana, in a matter within the jurisdiction of the United States Department of Justice, a department of the Government of the United States, the defendant, **MICHAEL ARATA**, did knowingly and willfully make materially false, fictitious and fraudulent statements and representations to a Special Agent of the Federal Bureau of Investigation as more particularly described in each count below:

| COUNT | DESCRIPTION OF STATEMENT |
|-------|--------------------------|
| 22 | **MICHAEL ARATA** stated that he terminated his relationship with defendant **PETER HOFFMAN** in or about July 2009, when in truth and in fact, as he then well knew, he had continued working with **PETER HOFFMAN** including reviewing and preparing information for the January 20, 2010 application for tax credits and other tax credit related business ventures. |

[7]Count 1 alleges conspiracy, Counts 2-5 allege wire fraud as against only Messrs. Hoffman and Arata, Counts 6-20 allege wire fraud against all three defendants, Count 21 alleges mail fraud, and Counts 22 - 25 charge only Michael Arata with making false statements to federal agents in violation of 18 U.S.C. § 1001.

| | |
|---|---|
| 23 | **MICHAEL ARATA** stated that he was not aware that $350,000 in legal fees were submitted to the State of Louisiana for tax credits, when in truth and in fact, as he then well knew, he was aware that $350,000 in legal fees had been submitted to the State and he had personally provided information to the auditors in support of the claimed legal fees in order to assist in the completion of the January 20, 2010 application for tax credits. |
| 24 | Regarding film equipment reported in the February 26, 2009 tax credit application to the State of Louisiana, **MICHAEL ARATA** stated that the film equipment had been "acquired" in that the equipment would be contributed to 807 Esplanade by the vendor as a business partner, when in truth and in fact, as he then well knew, the equipment had not been acquired or contributed and that he had repeatedly advised the auditors and the State that the equipment had been purchased and paid for. |
| 25 | **MICHAEL ARATA** stated he thought he fully disclosed both sides of the transactions for construction and equipment expenditures to the auditors, when in truth and in fact, as he then well knew, he had purposely concealed the circular transactions from the auditors. |

All in violation of Title 18, United States Code, Section 1001.

All three defendants moved to dismiss Counts 1 through 21 of the second superseding indictment (which charge them with conspiracy to commit mail and wire fraud, as well as committing and aiding and abetting mail and wire fraud). On July 18, 2014 the Court denied the defendants' motions to dismiss. United States v. Hoffman, No. 14-22, 2014 WL 3589563, at *9-11 (E.D.La. July 18, 2014). Mr. Arata now seeks dismissal of Counts 22 through 25, the false statements charges, of the second superseding indictment.

I.
A.

"[T]he propriety of granting a motion to dismiss an indictment ... by pretrial motion is by-and-large contingent upon whether the

infirmity in the prosecution is essentially one of law or involves determinations of fact. If a question of law is involved, then consideration of the motion is generally proper." United States v. Fontenot, 665 F.3d 640, 644 (5th Cir. 2011)(quoting United States v. Flores, 404 F.3d 320, 324 (5th Cir. 2005)(internal quotation marks and citations omitted)). Mr. Arata does not allege that the false statement charges fail to state an offense. Rather, he seeks dismissal of Counts 22 through 25 of the second superseding indictment on the ground that the false statement counts breach a January 27, 2014 proffer agreement between him and the government.

*B.*

Like contracts between private parties, agreements executed during a criminal investigation or prosecution between the government and a witness, target, or accused are interpreted in accordance with general principles of contract law. See United States v. Castaneda, 162 F.3d 832, 835 (5th Cir. 1998). "Under these principles," the Fifth Circuit instructs, "if a defendant lives up to his end of the bargain, the government is bound to perform its promises." Id. at 835-36. On the other hand, "if a defendant 'materially breaches' his commitments under the agreement..., the government can be released from its reciprocal obligations." Id. at 836. However, due to the constitutional implications present in the criminal context, the government generally may not unilaterally nullify agreements; rather, a

special procedure[8] is triggered when the government takes the position that a criminal defendant has breached an agreement such as a non-prosecution agreement. See id.; cf. Kastigar v. United States, 406 U.S. 441, 460 (1972).[9] Notably, the focus is on the materiality of the defendant's alleged breach, and the burden of proof rests with the government:

> When the government believes that a defendant has breached the terms of a nonprosecution agreement and wishes to be relieved of performing its part of the bargain...due process [requires that] the government must prove to the court by a preponderance of the evidence that (1) the defendant breached the agreement, and (2) the breach is sufficiently material to warrant rescission. If the pleadings show no factual dispute, the court may determine breach as a matter of law.

Castaneda, 162 F.3d at 836. The Fifth Circuit has declined to announce precisely when a judicial determination of breach is required to comport with due process. Id. at 837 n.25 (noting that the government did not seek a judicial determination of breach until after the defendant had been indicted and that the defendant

---

[8]This ensures compliance with the Fifth Amendment Due Process guarantee, that "[n]o person ... shall be ... deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

[9]The Supreme Court in Kastigar explained that the government is absolutely prohibited from using information provided by a defendant who is granted use and derivative use immunity. 406 U.S. at 460. When a defendant claims that the government wrongly used immunized testimony, the government must prove by a preponderance of the evidence "that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." United States v. Cantu, 185 F.3d 298, 301-302 (5th Cir. 1999)(citation omitted).

did not contend that a hearing had to be held prior to indictment). What the case literature seems to require is that the government must prove material breach "[p]rior to prosecuting the defendant" (United States v. Cantu, 185 F.3d 298, 302 (5th Cir. 1999)) to insure that the defendant is given "the opportunity to debate this issue to the court." United States v. Miller, 406 F.3d 323, 334-45 (5th Cir. 2005).

II.
A.

The issue presented by Mr. Arata's motion to dismiss is whether the government breached the January 27 proffer agreement by indicting Mr. Arata on charges that he made false statements during his proffer meeting. If the government breached the proffer agreement, then (Mr. Arata submits) dismissal of the false statement counts (Counts 22 through 25) of the second superseding indictment is the remedy.

The Court turns to examine the written proffer agreement, which was signed on January 27, 2014 by counsel for the government and by Mr. Arata in advance of a proffer meeting held that day. The government insisted:

> It is my understanding that your client, Michael Arata, is interested in providing a proffer of information and cooperation to investigating agents. And, the government is also interested in pursuing this matter. However, before a decision can be reached concerning whether or not your client should be afforded any concessions, the proffer must take place. The proffer will allow the government to assess the value of

9

the information and ultimately reach a decision concerning your clients cooperation.

The requirements set out in this letter are necessary to avoid the need for a *Kastigar* or taint hearing, whereby the government would be forced to demonstrate that its evidence was not tainted by a statement made by your client during the proffer discussion, if there were a trial in this matter. Therefore, this letter sets forth the ground rules for addressing the proffer of information your client wishes to provide:

1.       Purpose: The purpose of your client making a proffer is to provide the government with an opportunity to assess the value, extent, and truthfulness of your client's information about the criminal liability of your client and others.

2.       Truth:  Your client's proffer must be completely truthful with no material misstatements or omissions of fact.

3.       Recording: At the government's option, the proffer interview may be tape-recorded, videotaped, or recorded through an agent's or government attorney's handwritten notes.

[4.       Polygraph examination requirement, which apparently was struck from letter and initialed and, thus, inapplicable.]

5.       No promises: While your client hopes to receive some benefit by cooperating with the government, your client expressly understands that the government is making no promise of any consideration at this time.

6.       No direct use: The government agrees that statements or information contained in your client's proffer may not be used in the government's case-in-chief against your client should a trial be held.  This provision does not apply to any statement made by your client regarding crimes of violence pursuant to paragraph 11 of this agreement.

7.       Impeachment: If your client should testify materially contrary to the substance of the proffer, or otherwise present in a legal proceeding a position

materially inconsistent with the proffer, the proffer may be used against your client as impeachment or rebuttal evidence, or as the basis for a prosecution for perjury or false statement.

8.      Derivative Use:   The government may make derivative use of, and may pursue investigative leads suggested by, any statements or information provided by your client's proffer.   This provision is necessary to eliminate the necessity of a Kastigar hearing wherein the government would have had to prove that the evidence it sought to introduce at trial or in a related legal proceeding is derived from "a legitimate source wholly independent" of statements or information from the proffer.   Furthermore, by signing this document, you and your client waive any hearing pursuant to Kastigar v. United States, 406 U.S. 441 (1972).

9.      Sentencing Information:   Your client understands that if he becomes an indicted defendant, the government, pursuant to 18 U.S.C. Section 3661, must provide to the client's sentencing judge the contents of the proffer. Pursuant to U.S.S.G. Section 1B1.8, however, the proffer may not be used to determine the appropriate guideline sentence, except as stated in the "Impeachment" paragraph above.

10.     Brady Discovery:   Your client understands that Brady v. Maryland and its progeny require that the government provide any other indicted defendant all information known to the government which tends to mitigate or negate such defendant's guilt.   Should your client's proffer contain Brady material, the government will be required to disclose this information to the appropriate defendant(s).

11.     Crimes of Violence:   Any statements made by your client concerning any crime of violence may be used against your client directly or indirectly.

12.     Full Agreement:   This document constitutes the full and complete agreement of the parties.

*B.*

In dispute is the scope and import of this agreement. Ostensibly characterizing the agreement as akin to a non-prosecution agreement, Mr. Arata contends that the false statement charges are a breach of the proffer agreement between him and the government, that the government failed to obtain pre-indictment court-approval to release itself from the proffer agreement, and that dismissal is the remedy.  Countering, the government advances three reasons to deny Arata's motion: (1) First, the government contends that there was no promise not to prosecute Mr. Arata; therefore, Mr. Arata's assertion that the government needed judicial approval to seek an indictment is refuted by the proffer agreement's plain terms. (2) Second, even assuming the proffer letter could be construed as a non-prosecution agreement, no agreement can oblige the government to obtain judicial approval as a prerequisite to *charging* a defendant; judicial examination of a non-prosecution agreement may be properly conducted post-indictment and, in any event, the absence of pre-indictment review does not warrant dismissal. (3) Third, even if Arata had a right to a pre-indictment judicial determination as to which party breached the agreement, he waived the issue by not raising it before the second superseding indictment was filed.

By way of reply, Mr. Arata urges the Court to reject the government's argument -- that the proffer agreement only bars the

use of Arata's statements at trial, and not before a grand jury --
because it elevates form over substance.  If the Court denies the
motion to dismiss, Mr. Arata points out, the government must
introduce his proffer statements in its case-in-chief in order to
prove the false statement counts; and this would breach the
agreement. Arata emphasizes that the government has made no effort
to show that Arata materially breached the proffer agreement, and
its failure to carry its burden of establishing a breach of the
proffer agreement before prosecuting Arata warrants dismissal of
the false statement counts.

*C.*

The terms of the proffer agreement are clear, simple, and
direct.  By its express terms, the proffer was a tool to assess Mr.
Arata's truthfulness.  Reasonably construing the agreement, the
government promised Mr. Arata one benefit: his proffer statements
would not be used against him "in the government's case-in -chief
... should a trial be held."  This is quite literally a limited
benefit;[10] the government did not promise derivative immunity, it
did not promise Mr. Arata that his statements would not be used in
a grand jury presentation, nor did it promise Mr. Arata that he
would not be charged or prosecuted related to the proffer
statements.  In fact, a fair reading of the proffer instructs that

_____

[10]Limited all the more by it being patently conditioned on Mr.
Arata's truthfulness.

13

prosecution remained a possibility. Paragraph 2 required truthfulness. Considering the plain words used in the proffer agreement, the Court finds that the government has not breached the proffer agreement simply by presenting to the grand jury and including the false statement counts in the superseding and second superseding indictment. Accordingly, the government did not need to seek the Court's advance permission to charge Mr. Arata, and dismissal of the false statement counts is therefore not warranted.

As Mr. Arata points out,[11] however, this decision fails to address what would seem to be an obvious unresolved issue that must be dealt with, pre-trial, after an evidentiary hearing (or, at the very least, on a better factual record than the Court has before it).[12] If this case goes to trial, as it is slated to do in January

_____

[11]Mr. Arata argues that ignoring this issue until trial does not make sense, and he urges the Court to either dismiss the false statement counts or preclude the government from introducing Arata's statements in its case-in-chief. The Court declines to dismiss the false statement counts for the reasons stated, and notes that the proffer agreement provides that the government may not introduce Mr. Arata's statements in its case-in-chief; the government has neither endeavored to be, nor has been, absolved from its promise.

[12]The only record facts, which are not probative of the inevitable issue of material breach, are undisputed:
- On January 27, 2014 the government and Mr. Arata entered into a proffer agreement.
- Ten days later, the government indicted Mr. Arata.
- Two months later, the government obtained a superseding indictment against Mr. Arata that for the first time included charges that Mr. Arata made false statements to federal agents at the proffer.
- On May 15, 2014 the government obtained a second superseding indictment, which contained the same false statement charges.

14

2015, it would appear that the government must use Mr. Arata's proffer statements in its case-in-chief in carrying its burden to prove its charges that he made false statements during the proffer meeting. That would violate the clear terms of the proffer agreement. Neither Mr. Arata nor the government has requested an evidentiary hearing on the present motion. Yet both seem to agree that an evidentiary hearing is contemplated when it becomes the Court's task to determine, based on record facts, whether or not Mr. Arata materially breached an agreement with the government such that the government is absolved of any of its obligations under the proffer agreement.[13]  Nevertheless, the issue is not squarely before the Court at this time, and the record is ill-suited to address, much less resolve, this premature issue.

IT IS ORDERED: that Mr. Arata's motion to dismiss is DENIED without prejudice.

New Orleans, Louisiana, October 8, 2014

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

•    At no time did the government seek judicial approval to charge Arata with making false statements.

[13]If the case literature outlined by the Court and briefed by the parties is to be the Court's guide, then such a hearing indeed must occur in advance of the government use of Mr. Arata's proffer statements during its case-in-chief.

15