UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 14-22** |
| v. | * | **SECTION: F** |
| **PETER M. HOFFMAN** | * | |
| **MICHAEL P. ARATA** | | |
| **SUSAN HOFFMAN** | * | |

\* \* \*

### UNITED STATES' MEMORANDUM IN SUPPORT OF
### MOTION TO VITIATE PROFFER AGREEMENT

As this Court noted in its October 8, 2014 Order and Reasons, "The terms of [Arata's] proffer agreement are clear, simple, and direct. By its express terms, the proffer was a tool to assess Mr. Arata's truthfulness." (Rec. Doc. 175). Moreover, the proffer was "patently conditioned on Mr. Arata's truthfulness." *Id*. at 13, fn. 10. As shown by the evidence below, Arata "materially breached [his] agreement with the government such that the government is absolved of any of its obligations under the proffer agreement." *Id*. at p. 15.[1] With regard to false statements, materiality is defined as a statement having "a natural tendency to influence, or [being] capable of influencing, a decision of the decision making body to which it is addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995).

### I.   THE PROFFER

As detailed in the Government's Memorandum in Opposition to Arata's Motion to Dismiss Counts 22 through 25 (Rec. Doc. 169, pp. 2-5), after months of discussions, and litigation over the attorney-client privilege, Arata's proffer was taken on the eve of the

---

[1] As noted by this Court, the government's burden of proof is by "a preponderance of the evidence." *Id*. at p. 8 (citing *United States v. Castaneda*, 162 F.3d 832, 836 (5th Cir. 1998)).

indictment so that his culpability could be assessed.[2]  The defendant repeatedly lied in a final attempt to influence the government not to indict him along with Peter Hoffman.

## II.     COUNTS 22 and 23: Termination of Arata's Relationship with Peter Hoffman and Submission of Legal Fees to the State

In an attempt to distance himself from Hoffman, Arata falsely stated during the proffer that "he terminated his relationship with Peter Hoffman in or about July 2009."[3]  Exhibit A, p. 2.  This time period is important because it was shortly before the defendants made key misrepresentations that would form the basis of their January 20, 2010 application for tax credits.  Although Peter Hoffman and Arata had a falling-out in the beginning of August 2009,[4] the co-defendants reconciled in time to file the second application with the State.  *See* Exhibit D, discussed below.

Among the fictitious expenditures included in the January 20, 2010 application were hundreds of thousands of dollars in bogus legal fees for Peter Hoffman and Arata.  Although Arata admitted during his proffer that the legal fees were bogus, he falsely stated that "he was not aware that the [ ] legal fees were submitted to the State for tax credits."[5]  Exhibit A, pp. 3-4.

The following attached items were obtained from sources including the auditors, the State, Peter Hoffman and Arata.[6]  When reviewed in sequence, these items prove by a preponderance of the evidence that Arata lied during the proffer about the termination of his

---

[2] A copy of the FBI 302 of Arata's interview (Exhibit A) and a copy of Arata's proffer agreement (Exhibit B) are attached.
[3] Count 22
[4] According to Arata's statements during the proffer, Arata discovered that Peter Hoffman was fabricating documentation for distribution expenses in July 2009. Exhibit A, p. 1 – 2. Arata claimed that he terminated his relationship with Peter Hoffman as a result of this discovery. *Id*. at 2. Arata sent a termination letter to Peter Hoffman on August 6, 2009 (attached as Exhibit C).
[5] Count 23
[6] Certain information such as email addresses, social security numbers and names of individuals not anticipated as witnesses in this matter have been redacted. All parties have access to the unredacted exhibits. Unredacted copies are available at the Court's request.

relationship with Peter Hoffman in July 2009 and also lied about his knowledge of, and involvement in, the submission of bogus legal fees to the State for tax credits after July 2009:

- **Exhibit D:** November 12, 2009 email from Arata to Peter Hoffman.

    After having a falling-out at the beginning of August 2009, Arata and Peter Hoffman reconciled in time to file the second application with the State. Arata wrote to Peter Hoffman:

    Arata: Indeed, both Jerry[7] and I believe that the strong relationship we both have with you warrants that end, and we both have the expectation that the relationship will continue to our mutual personal and professional benefit, on 807 and any other projects you may have.

- **Exhibit E:** December 21, 2009 emails between Arata and his business partner.

    At the end of December 2009, Peter Hoffman created invoices for legal fees allegedly due to Peter Hoffman and Arata for 807 Esplanade. After learning about the claimed legal fees, Arata contacted his business partner, Jerry Daigle, and joked with Daigle about the legitimacy of the claimed legal fees:

    Arata: He wants to submit [the legal fees invoices] for tax credits. Ha!

    Daigle: It's a nice round number . . . like all legal fees!

    Arata: And since I was not his lawyer for the deal, it makes it even better. What he could submit and what is actual are the bills he got from [], even the [] bills. But instead, he claims to [be] a Louisiana lawyer and puts me down as receiving $150K in fees! Love it. Is there any way I let this go through?

    Daigle: Maybe you should repond with the suggestion of including [] and [] rather than you?

    Arata: Good call!

---

[7] Jerry Daigle and Arata owned Voodoo Studios, LLC, which owned part of 807 Esplanade.

3

- **Exhibit F:**       **December 23, 2009 email from auditor to Arata attaching legal fee invoices.**

The legal fees invoices were provided to the auditor, and on December 23, 2009 the auditor emailed the legal fee invoices to Arata for review.

- **Exhibit G:**       **December 24, 2009 email from Arata to his business partner.**

The day after receiving the invoices from the auditor, Arata again joked about the legitimacy of the invoices with Jerry Daigle:

Arata:     So even after I told his office not to submit this, and to use the other valid expenses, he submitted this to [the auditor] without my approval. And look at the address.[8] Classic. She is convinced that everything he has submitted is fake. Nice!

- **Exhibit H:**       **December 28, 2009 email between Arata and auditor.**

On December 28, 2009, the auditor asked Arata if he approved the hours on the legal fee invoices. In response, Arata joked about the address on the invoice being in California instead of Louisiana, but did not disapprove the hours or legal fees.

- **Exhibit I:**       **December 29, 2009 emails between auditor and Peter Hoffman regarding proof of claimed expenditures.**

On December 28 and 29, 2009, the auditor and Peter Hoffman exchanged emails regarding proof of several claimed expenditures. Number "1" on the list of issues discussed by the auditor and Peter Hoffman related to the legal fees for Arata and Peter Hoffman. The discussion on that issue has been excised below for the Court's convenience:

Auditor:     We will need a third party verification on the legal fees from Peter and Michael. Were you all paid the hours billed? Peter, are you licensed to practice law in Louisiana?

Hoffman:     The company was [p]aid, not us. We both have equity in the company. Michael and I both reviewed the invoice and accept it. I will have him email you if necessa[]ry. I am not admitted to practi[c]e her[e] but am admitted pro ha[]c when necessary. Admission to practi[c]e is not necessary to perform legal services in the state when there is Louisiana co-counsel.

---

[8] The phony invoice listed California instead of Louisiana.

4

| | |
|---|---|
| Auditor: | I will need confirmation from Michael.  Do you want me to email him directly? |
| Hoffman: | Please email him directly but I'll call him as well. |
| Auditor: | I will. |
| Hoffman: | I spoke to Michael and he is expecting your call. |
| Auditor: | Yes, please give me a call in the morning.  The problem I am having with all of these are proper paper documentation and quotes from third parties to determine fair market value.  Invoices from your own company is not good enough when the companies are related.  Please note that I do ask all of my clients for this.  Word is not good enough – the proof is in the documents.  Can you please get me the information requested before our call? |

- **Exhibits J & K:     December 31, 2009 emails from Arata to auditor supplying equity interest and ownership proof.**

Two days later, Arata provided proof of his ownership interest in Seven Arts Pictures Louisiana (SAPLA) to the auditor in support of Peter Hoffman's claim that Arata's legal fees were paid by increasing Arata's equity interest in SAPLA.  *See* Exhibits I, M and N.

- **Exhibit L:         December 31, 2009 email between Seven Arts in-house accountant, Peter Hoffman and Arata.**

In addition to the legal fee invoices, Arata reviewed affidavits by Peter Hoffman and Susan Hoffman used to support bogus 807 Esplanade supervisory and management fees submitted to the State for tax credits.  This email provides further proof that Arata did not terminate his relationship with Peter Hoffman in July 2009, but continued his involvement in preparing the January 20, 2010 application to the State.

- **Exhibit M, N & O:  January 7 and 8, 2010 emails between auditor and Peter Hoffman regarding legal fees.**

On January 7 and 8, 2010, Peter Hoffman and the auditor continued their discussion regarding proof of claimed legal fee expenditures:

| | |
|---|---|
| Auditor: | I am going through all of the documents and we get you a draft of the report [of expenditures to be submitted to State] this week for your review.  However, we are disallowing the following costs due to lack of supporting documents . . . Michael stated that he did not receive the money for |

5

|          |          |
|----------|----------|
| | which you are billing a company he has no interest in, so I am taking out his hours and fees of $203,637.50.  *See* Exhibit M. |
| Hoffman: | Michael did not receive this money because he is an equity owner as I thought he proved to you.  He acknowledges that the value for his services is the increase in value of his equity in the project, which is what he told me he told you.  He will confirm that and this also can be included in the rep letter.  Please reconsider.  *Id.* |
| Hoffman: | I spoke to Michael.  He was confused because Voodoo's equity interest is in SAPLA and he had forgotten that Voodoo gets the same interest in the sub-tenant which he did not realize was SAFELA.  Without that equity his equity in SAPLA would be worthless as the revenues from operation will be received by the sub-tenant under the federal rehab tax credit structure.  He knew we needed to do this but didn't realize this was the entity.  I'll have him forward to you the current operating agreement of SAFELA for confirmation of his equity interest through Voodoo.  *See* Exhibit N. |
| Hoffman: | Michael just texted me to tell me he didn't get on the plane to LA after this am!  I will ask him to write to you with a copy to me confirming: (a) he has an equity interest in Voodoo and Voodoo has an equity interest in SAFELA and (b) the operating agreement for SAFELA he is sending is correct and reflects this equity interest.  Will this be OK or is there more that you need from him?  I thought he confirmed he worked the hours (which [he] surely did) and the billing rate is his normal rate.  *See* Exhibit O. |
| Auditor: | He did confirm the hours – yes, can you please get him to write to me about the other issues.  Is there an agreement to say this?  *Id.* |
| Hoffman: | Yes I am trying to get him on the phone.  *Id.* |

- **Exhibit P:**          **January 12, 2010 email from Peter Hoffman to Arata.**

After three weeks of discussions and correspondence between Peter Hoffman, Arata and the auditor about the claimed legal fees, Peter Hoffman made a personal appeal to Arata:

| | |
|---|---|
| Hoffman: | I just talked to Jerry who said everything is ok.  Please send the email to [the auditor] *ASAP so that she doesn't get any more suspicious than she already is*. . . . (emphasis added). |

6

- **Exhibit Q:**        January 12, 2010 email from Arata to auditor.

    As Peter Hoffman requested, one and a half hours later, Arata emailed the requested information to the auditor in support of the legal fees:

    Arata:    As we mentioned on the phone, attached is the executed SAFELA Operating Agreement evidencing Voodoo's 40% interest in this entity. *We hope this helps you and Peter wrap up the SAPL audit.* (emphasis added).

- **Exhibit R:**        January 20, 2010 application filed with State.

    After receiving Arata's support, the audit report was finished and filed with the State on January 20, 2010. The application claimed $5,980,838 in additional 807 Esplanade expenditures including $350,000 in legal fees for Peter Hoffman and Arata. *See* Exhibit R, p. 6.

- **Exhibits S:**        April 13, 2010 and May 14, 2010 emails regarding the auditor's withdrawal of audit reports.

    On April 13, 2010, almost ten months after the supposed termination of their relationship, the defendants discussed the auditor's decision to withdraw all audit reports after the State uncovered some of the fraudulently claimed expenditures:

    Hoffman:    . . . [the auditor] wrote to me yesterday seeking to withdraw all three audit reports on 807 Esplanade. I think we both need to meet with him to disabuse him of this request. Can you [s]et up a time with him on Thursday that is convenient for you? Can you follow up with "legal" at the Film Commission to see if we can get cert this week?

    Arata:    This sounds drastic. I think you need to meet with him privately and see if he will let you know what his reasons are . . . I will put a call into him and see if he will tell me "off the record". This is not a good development for 807 or for SAPL, and I think AD CAP needs to be made aware of this after your meeting with him.

    Hoffman:    . . . I'll forward to you [the auditor's] email. Please set the meeting first for you and me with [the auditor] to see if we can talk him out of what you accurately describe as a drastic course of action.

7

On May 14, 2010, Peter Hoffman and Arata were notified that the first audit report was being withdrawn due to "errors" discovered in claimed expenditures:

Auditor: I am getting heat from the film office because the State auditor found that the $3.7 million the report was not correct and should be $1.7 million. So we know of a $2 million error in the audit. At this time this has no effect on your credits because credits were not issued on this amount but we have an incorrect audit issued. The auditor as well as our firm knows about the equipment issue in that the sales tax was never paid and the equipment is not in Louisiana. Peter if you bring the equipment into Louisiana and pay sales tax on it immediately you could cure this.

Hoffman: [P]lease do not send this letter which is false and its withdrawal will subject your firm to serious liability to Seven Arts and its transferees. Under the law the previous audit was certified and is irrevocable. Please do not force us to sue your firm for damages and create a godawful mess when you continue to operate under false set of facts. Can we discuss this later today before we go into an entirely adverse position?

Auditor: Effective immediately [the auditor] will no longer be representing you or any of your companies. We are sending you a formal letter today. Because of errors that have been discovered in the first audit report we are recalling it.

Hoffman: I regret that you have taken this self destructive and damaging course of action. You will only harm Seven Arts and yourself for no gain, except perhaps in self righteousness which I can assure will be cold comfort indeed. . . .

The above records show that Arata made materially false representations regarding his knowledge of the submission of the legal fees and about terminating his relationship with Peter Hoffman in July 2009. After July 2009, Arata personally assisted in completing the January 20, 2010 application to the State by helping to convince the auditor to include the bogus legal fees in the audit report and by reviewing the Hoffmans' affidavits which claimed thousands of hours of "supervisory" work that was submitted as expenditures to the State. Additionally, ten months after the supposed termination of the relationship, the documents above show that Arata still worked with Peter Hoffman after the State uncovered some of the fraudulently claimed

8

expenditures and the auditors withdrew their reports. Indeed, Arata continued his relationship with Peter Hoffman on film-related projects into at least 2011. *See* Exhibit T (January 4, 2011 email from Peter Hoffman to Arata attaching Loan and Security agreement for the film "Booty Patrol.").

During the proffer, Arata tried to minimize his criminal exposure by removing himself from the scheme as early as possible. Because he and Peter Hoffman had a falling-out in the beginning of August 2009, Arata used that circumstance to try and convince the government that he had terminated the relationship prior to the submission of the January 20, 2010 application. His motive for the deception was to avoid being charged with $5,980,838 in new expenditures that were submitted to the State on January 20, 2010 – which included bogus legal fees for Arata.

### III.    COUNT 24:   The Film Equipment

During the proffer, Arata was questioned regarding the claimed purchase of $1,027,090 in film equipment from Departure Studios in California. *See* Exhibit A, pp. 8-10. The FBI was concerned that this was a fictitious expenditure. Arata stated that the film equipment had been "acquired" in that the equipment would be contributed to 807 Esplanade by the vendor as a business partner and that he did not think the equipment had been "purchased" or "paid for." Exhibit A, p. 9. This statement is materially false and was intended to mislead the FBI with regard to Arata's intent. To this day, no film equipment has been contributed by Departure and no partnership with Departure has commenced. Indeed, to the contrary, the evidence shows that Arata tried to mislead the auditors and the State into believing that the equipment had been purchased and paid for. These documented misrepresentations, which are inconsistent with Arata's proffered claims of a business contribution, are proof that Arata knew the equipment had not been acquired in any manner:

9

- **Exhibit U:**          **November 19, 2008 email from employee of Seven Arts to Arata attaching both sides of the Departure Studios circular transactions.**

On November 19, 2008, Arata attempted to convince an auditor[9] that $1,027,090 had been spent on purchasing equipment from Departure Studios:

Arata:   [T]his email will also confirm that Seven Arts Pictures has no 'sale' contract for the equipment.  The two companies have a long standing relationship and all *equipment purchases* were done using the specification sheets you were given and *the invoices for payment of same.  The bank statements will evidence the payments*. . . .  (emphasis added).

Later that day, an employee for Seven Arts sent wire transfers for Departure Studios for Arata to review:

Employee:   Michael . . . please find attached the Departure invoices and signed wires . . . PLEASE print and review <u>before sending</u> as discussed.  (emphasis in original).

In the attachment to the email, on pp. MA-005106 – MA005129, the Court will notice 23 wire transfer requests bouncing money back and forth between Seven Arts Pictures Louisiana and two other entities: Departure Studios and the general contractor of 807 Esplanade – all on October 2, 2008. With regard to Departure Studios and the film equipment, the attachments include five separate wire transfer requests (4 x $250,000 and 1 x $27,090 = $1,027,090) going from Seven Arts Pictures Louisiana to Departure Studios NOLA and back on the same day.  The total, $1,027,090, is the amount reported to the auditors and the State as having been "expended" on film equipment.  *See* Exhibit W, below.

- **Exhibit V:**          **December 1, 2008 email from Arata to auditor.**

After receiving both sides of the wire transfers in Exhibit U, Arata sent only the outgoing "payment" side of the circular transaction to the auditor as shown in the transfers attached to Exhibit V.  This created the illusion that SAPL had divested itself of $1,027,090 and paid Departure Studios:

---

[9] This is the first auditor hired to audit 807 Esplanade.  This auditor resigned prior to any applications being submitted to the State because she was unable to get proper proof of expenditures from Arata and the Hoffmans. *See* Exhibit A, p. 9 ("Regarding [the auditor's] firm walking away from their engagement with SAPL, Arata said [the auditor] kept asking questions and Hoffman got upset about it and told them to 'go f[] themselves.'").

10

    Arata:       Attached are the bank documents showing *payment* from SAPL, LLC to Departure Studios NOLA, LLC.  Michael.  (emphasis added).

- **Exhibit W:**      **May 14, 2009 email from Arata to State and auditor attaching proof of payment for Departure Equipment.**

Arata then tried to convince the State that the equipment had been paid for:

    Arata:       Following are the items you requested for the SAPL project.  1. Independent verification we received from the . . . equipment vendor for [the auditor].  These set forth the *payments* received and *items paid for*. . . The equipment vendor is a Louisiana company (see attached), but they DID NOT charge tax on the *items sold*.  (emphasis added).

On the second page of this exhibit, the Court will note that Arata attached a signed payment receipt verification.  The verification shows an invoice, an invoice date and requests that Departure Studios "please confirm that the [$1,027,090 for film equipment] *has been paid*."  (emphasis added).  The representative of Departure Studios confirms that $1,027,090 was "*paid* to [the] company, as itemized in the attachments."  (emphasis added).

The third page of the exhibit purports to be an invoice from the vendor.

- **Exhibit X:**      **Seven Arts Pictures Louisiana Bank Account Statement.**

This exhibit shows that on October 3, 2008, SAPL received $400,000 in cash from Arata's company Leap Film Fund (line 2 of Deposits).  As a consequence of the wire transfers in Exhibit U, this money bounced back and forth between the accounts of SAPL and Departure Studios to create the appearance of payments for the $1,027,090 in equipment (see line 3 of Deposits and line 2 of Withdrawals).  On October 7, 2008, the $400,000 inserted by Arata was withdrawn and sent back to Leap Film Funds after the circular transactions were complete (last line of Withdrawals).

    The above evidence shows that Arata knew that the equipment had not been "acquired" or "contributed."  In truth, the equipment had not been obtained in any manner.  Arata's knowledge of this is demonstrated by his providing bank transfer records, invoices and signed payment receipts to create an illusion that the film equipment had been paid for and purchased from a "vendor."  *See* Exhibit W ("These set forth the payments received and items paid for. . . The equipment *vendor* is a Louisiana company. . . .") (emphasis added).  Arata's false statement

11

was intended to mislead the government into believing that Arata did not intend to defraud the auditor or the State with regard to the film equipment, however, the above evidence shows that is precisely what he did.

## IV.     COUNT 25:   Disclosure of Circular Transactions

Arata falsely represented at the proffer that he "thought he fully disclosed both sides of the transactions for construction and equipment expenditures." *See* Exhibit A, p. 10.  In truth, as he knew, he had purposely culled out the back end of the circular transactions to mislead the auditors and the State.

As discussed above regarding Exhibit W, on October 3, 2008, Arata helped conduct the circular transfers at Regions Bank by inserting $400,000 to be bounced back and forth in between bank accounts controlled by the defendants.  *See* Exhibit X.  On November 19, 2008, Arata received copies of both sides of the Regions Bank wire transfers for equipment and construction.  *See* Exhibit U.  On December 1, 2008, Arata purposely withheld from the auditor the back half of the circular transactions related to film equipment.  *See* Exhibit V.  The very next day, on December 2, 2008, Arata purposely withheld from the auditor the back half of the circular transactions related to construction.  *See* Exhibit Y.  Arata then signed and submitted fraudulent payment receipt certifications for construction and film equipment.  *See* Exhibit W.

Considering the above, it is clear that Arata knew that he was not fully disclosing both sides of the circular transactions to the auditors.  It was part of the scheme.  His actions were deliberate and intended to falsely make it appear that certain items had been paid for so that he could claim tax credits from the State to which he would not otherwise be entitled.  His false statements during the proffer were meant to mislead the government with regard to his intent in submitting bank transfers to the auditors and the State.

## V.  CONCLUSION

Arata was debriefed on the eve of indictment to give him a final opportunity to tell his side of the story. Arata gave false statements in an attempt to "influence the government's decision" whether to present an indictment against him. *Gaudin*, 515 U.S. at 509.

Furthermore, it is important to note that the parties agree that Arata's 302 is an accurate representation of Arata's statements during his debriefing.[10] Considering this, and in light of the volume of documentary evidence presented with this motion, the government submits that it has shown by at least a preponderance of the evidence that Arata knowingly made at least one material false statement sufficient to vitiate the entire proffer agreement. *Castaneda*, 162 F.3d at 836. "If the pleadings show no factual dispute, the court may determine breach as a matter of law." *Id*.

The government respectfully requests that this Court find by a preponderance of the evidence that Arata breached the proffer agreement and rule that the government is released from its conditional agreement not to use Arata's proffered statements in its case-in-chief.

Respectfully submitted,

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

s/ G. Dall Kammer
G. DALL KAMMER (LA 26948)
CHANDRA MENON
JAMES BAEHR
Assistant U.S. Attorneys
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3168
Email: dall.kammer@usdoj.gov

---

[10] In correspondence with the government counsel for Arata has only questioned a minor point irrelevant for purposes of this motion.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

s/ G. Dall Kammer<br>
G. DALL KAMMER<br>
Assistant United States Attorney