UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

v.                                          NO. 14-022

MICHAEL P. ARATA                            SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court are two motions: (1) the government's motion to vitiate the proffer agreement with Arata; and (2) Michael Arata's motion to dismiss for prejudicial joinder or, alternatively, to sever.  For the reasons that follow, the Court defers ruling on the government's motion pending a limited evidentiary hearing, and Arata's motion is DENIED.

## **Background**

Peter and Susan Hoffman and Michael Arata were partners in various movie-related business ventures.  One such venture was the purchase and renovation of a dilapidated mansion on Esplanade Avenue in New Orleans, which they turned into a post-production film editing facility.  This federal white collar criminal case arises from the government's allegations that -- in connection with the renovation project -- the Hoffmans and Mr. Arata (through companies they owned) allegedly committed, aided and abetted, and conspired to commit, mail and wire fraud by submitting false expense reports in order to deceive the State of Louisiana into

1

issuing state tax credits that they had not actually earned and were not entitled to receive.[1]  Mr. Arata, alone, is also charged with making false statements to federal agents.

The facts giving rise to this criminal case are more completely summarized in the second superseding indictment and in this Court's Order and Reasons dated July 18, 2014.  United States v. Hoffman, No. 14-22, 2014 WL 3589563, at *1-3 (E.D.La. July 18, 2014).  The background facts most pertinent to the resolution of the present motion are summarized here.

In renovating the property at 807 Esplanade Avenue, Peter Hoffman,[2] Susan Hoffman,[3] and Michael Arata,[4] through their

---

[1]The backdrop of this federal criminal case is a Louisiana state law tax credit program, in which individuals and businesses that applied to the State for film infrastructure tax credits were entitled to receive an amount equal to 40% of their qualified and audited film infrastructure expenditures.  Once certified, the applicants could then sell the certification to local businesses and individuals, who would then use the tax credit certifications to offset taxes that the businesses and individuals would otherwise have owed to the State of Louisiana.

[2]Peter M. Hoffman, the government alleges, was the CEO of Seven Arts Entertainment, Inc., a company involved in the motion picture and entertainment industry in California.  Mr. Hoffman was also an attorney and served as a executive in numerous financial and tax-preferred financings for over 25 years. He also owned, operated, and controlled numerous companies affiliated with Seven Arts Entertainment, Inc.

[3]Susan Hoffman, the government alleges, was a California film producer who relocated to New Orleans.  Susan Hoffman also owned and operated several companies, including Leeway Properties, New Moon Pictures, LLC, and Seven Arts Pictures Louisiana, LLC.

[4]Michael P. Arata, it is alleged, was also a Louisiana attorney and businessman who owned and operated companies involved

respective companies, availed themselves of the Louisiana film infrastructure tax credit program. They submitted three applications and supporting documents to the State for tax credits. As statutorily required, the defendants first submitted the 807 Esplanade expenditures to auditors for verification. To verify the expenditures, the auditors requested proof of payment such as invoices, bank transfers, bank statements, and other corporate financial records. Based on this information, the auditors created audit reports detailing the defendants' claimed expenditures on 807 Esplanade. These audit reports were submitted as part of the February 26, 2009, January 20, 2010, and July 3, 2012 submissions to the State for film infrastructure tax credits.

On June 19, 2009 the State issued $1,132,480.80 in tax credits to Seven Arts Production Louisiana, LLC as a result of the first application, the February 26, 2009 submission. Mr. Arata paid cash to the partnership for these tax credits, at a discounted price, through his company LEAP Film Fund II, LLC, and then sold the tax credits to local businesses and individuals for profit. (The State did not issue tax credits based on the January 20, 2010 and July 3, 2012 applications).

---

in the movie and entertainment industry, including Seven Arts Pictures Louisiana, LLC, Voodoo Production Services, LLC, Voodoo Studios, LLC, and LEAP Film Fund II, LLC, which purchased, sold and brokered Louisiana film tax credits.

On January 27, 2014 Mr. Arata, during the government's investigation, with his counsel present, made statements to a Special Agent of the FBI pursuant to a written proffer agreement with the government.   The government bargained for "completely truthful" information "with no material misstatements or omissions of fact" so that it could "assess the value, extent, and truthfulness of [Mr. Arata's] information about the criminal liability of [Mr. Arata] and others" in order to "ultimately reach a decision concerning [Mr. Arata's] cooperation." In exchange, Mr. Arata received assurances from the government that "statements or information contained in [Mr. Arata's] proffer may not be used in the government's case-in-chief against [Mr. Arata] should a trial be held."[5]

Shortly thereafter, on February 6, 2014 a grand jury returned a six-count Indictment, charging Peter Hoffman and Michael Arata with conspiracy (Count 1), as well as aiding and abetting, and actually committing wire fraud (Counts 2 - 6), in violation of 18 U.S.C. §§§ 371, 2, 1343.   After first superseding on April 3, 2014,[6] the government filed a 25-count second superseding

---

[5]Although the government agreed not to directly use Mr. Arata's proffer statements or proffer "in the government's case-in-chief", the parties agreed that "[t]he government may make derivative use of...any statements or information provided by [the] proffer."

[6]This Superseding Indictment filed on April 3, 2014 charged Susan Hoffman for the first time, and added additional charges against the other defendants: conspiracy (Count 1), wire fraud and

indictment on May 15, 2014, charging the Hoffmans and Mr. Arata with conspiring to commit, committing, and aiding and abetting, wire and mail fraud, in violation of 18 U.S.C. §§§§ 371, 1343, 1341, and 2.

With respect to Count 1, which alleges conspiracy to use the mail or wires in furtherance of the defendants' scheme to defraud, the government alleges 37 specific overt acts, and charges that the defendants accomplished their conspiracy, and took steps to conceal their scheme from the State, when they: 1). prepared and filed material false and misleading tax credit applications, fraudulently claiming that certain expenditures had been made to 807 Esplanade when those expenditures had not been made; 2). prepared and submitted to the auditors and to the State materially false and misleading internal accounting books and records and payment receipt certifications to make it appear as if certain expenditures had been made and certain items had been paid for and received when those expenditures had not been made and those items had not been paid for or received; 3). prepared and submitted to the auditors and the State materially false and misleading invoices in support of fraudulent expenditures; 4). conducted materially false and misleading circuitous bank transfers of money to make it appear

aiding and abetting against Peter Hoffman and Michael Arata (Counts 2 - 5), wire fraud and aiding and abetting against all three defendants (Counts 6 - 17), mail fraud and aiding and abetting against all three defendants (Count 18), and false statements against Michael Arata only (Counts 19 - 22).

that certain items were paid for when those items had not been paid
for; and 5). prepared and submitted to the auditors proofs of
payment that were materially false and misleading in that only
outgoing money transfers were disclosed to the auditors when the
money had actually been immediately returned to the original bank
account and those return money transfers were not disclosed to the
auditors.

As to the wire fraud charges (Counts 2 - 5 against Peter
Hoffman and Michael Arata and Counts 6 - 20 against all three
defendants), the government alleges:

> Beginning on or about March 1, 2006, and continuing until
> on or about July 3, 2012, in the Eastern District of
> Louisiana and elsewhere, the defendants, Peter Hoffman,
> Michael Arata, Susan Hoffman ... did knowingly and
> willfully devise and intend to devise a scheme and
> artifice to defraud and to obtain money and property by
> means of false and fraudulent pretenses, representations
> and promises by submitting and causing to be submitted
> materially false, misleading and fraudulent information
> to the auditors and to the State of Louisiana for the
> purpose of obtaining infrastructure tax credits relative
> to 807 Esplanade.  All in violation of Title 18, United
> States Code, Sections 1343 and 2.

With respect to the mail fraud charge (Count 21), the government
alleges:

> On or about February 3, 2010 ... the defendants, Peter
> Hoffman, Michael Arata, Susan Hoffman ... for the purpose
> of executing and attempting to execute, and in
> furtherance of, the scheme and artifice to defraud set
> forth in paragraph 2 of Counts 6 through 20 above, did
> knowingly send and cause to be sent, delivered, and moved
> by private commercial interstate carriers correspondence
> dated February 2, 2010, addressed to an auditor for the
> State of Louisiana with attached exhibits, corporate
> agreements, and invoices for project management,

6

equipment consulting, and office rent.  All in violation of Title 18, United States Code, Sections 1341 and 2.

The second superseding indictment also charges Mr. Arata with making false statements to federal agents.[7]  The false statement counts -- Counts 22 through 25 -- charge:

### COUNTS 22 - 25
**(False Statements)**

On or about January 27, 2014, in the Eastern District of Louisiana, in a matter within the jurisdiction of the United States Department of Justice, a department of the Government of the United States, the defendant, **MICHAEL ARATA**, did knowingly and willfully make materially false, fictitious and fraudulent statements and representations to a Special Agent of the Federal Bureau of Investigation as more particularly described in each count below:

| COUNT | DESCRIPTION OF STATEMENT |
|-------|--------------------------|
| 22 | **MICHAEL ARATA** stated that he terminated his relationship with defendant **PETER HOFFMAN** in or about July 2009, when in truth and in fact, as he then well knew, he had continued working with **PETER HOFFMAN** including reviewing and preparing information for the January 20, 2010 application for tax credits and other tax credit related business ventures. |
| 23 | **MICHAEL ARATA** stated that he was not aware that $350,000 in legal fees were submitted to the State of Louisiana for tax credits, when in truth and in fact, as he then well knew, he was aware that $350,000 in legal fees had been submitted to the State and he had personally provided information to the auditors in support of the claimed legal fees in order to assist in the completion of the January 20, 2010 application for tax credits. |

---

[7]Count 1 alleges conspiracy, Counts 2-5 allege wire fraud as against only Messrs. Hoffman and Arata, Counts 6-20 allege wire fraud against all three defendants, Count 21 alleges mail fraud, and Counts 22 - 25 charge only Michael Arata with making false statements to federal agents in violation of 18 U.S.C. § 1001.

7

| 24 | Regarding film equipment reported in the February 26, 2009 tax credit application to the State of Louisiana, **MICHAEL ARATA** stated that the film equipment had been "acquired" in that the equipment would be contributed to 807 Esplanade by the vendor as a business partner, when in truth and in fact, as he then well knew, the equipment had not been acquired or contributed and that he had repeatedly advised the auditors and the State that the equipment had been purchased and paid for. |
| 25 | **MICHAEL ARATA** stated he thought he fully disclosed both sides of the transactions for construction and equipment expenditures to the auditors, when in truth and in fact, as he then well knew, he had purposely concealed the circular transactions from the auditors. |

All in violation of Title 18, United States Code, Section 1001.

All three defendants moved to dismiss Counts 1 through 21 of the second superseding indictment (which charge them with conspiracy to commit mail and wire fraud, as well as committing and aiding and abetting mail and wire fraud) on the ground that the indictment fails as a matter of law to state offenses against the United States; unissued tax credits, the defendants submitted, are not "property" and, therefore, cannot be the object of a mail or wire fraud scheme.  On July 18, 2014 the Court denied the defendants' motions to dismiss Counts 1 through 21, holding that the film tax credits at issue constitute "money or property." United States v. Hoffman, No. 14-22, 2014 WL 3589563, at *9-11 (E.D.La. July 18, 2014).  Thereafter, Mr. Arata sought dismissal of Counts 22 through 25, the false statements charges, on the ground that by bringing those charges the government breached a proffer agreement. In denying the motion without prejudice on October 8,

8

2014, the Court examined the terms of the written proffer agreement, which was signed on January 27, 2014 by counsel for the government and by Mr. Arata in advance of a proffer meeting held that day. See United States v. Hoffman, No. 14-22, 2014 WL 5040721 (E.D.La. October 8, 2014). The January 27, 2014 proffer letter states:

> It is my understanding that your client, Michael Arata, is interested in providing a proffer of information and cooperation to investigating agents. And, the government is also interested in pursuing this matter. However, before a decision can be reached concerning whether or not your client should be afforded any concessions, the proffer must take place. The proffer will allow the government to assess the value of the information and ultimately reach a decision concerning your clients cooperation.

> The requirements set out in this letter are necessary to avoid the need for a *Kastigar* or taint hearing, whereby the government would be forced to demonstrate that its evidence was not tainted by a statement made by your client during the proffer discussion, if there were a trial in this matter. Therefore, this letter sets forth the ground rules for addressing the proffer of information your client wishes to provide:

> 1.    Purpose: The purpose of your client making a proffer is to provide the government with an opportunity to assess the value, extent, and truthfulness of your client's information about the criminal liability of your client and others.

> 2.    Truth:  Your client's proffer must be completely truthful with no material misstatements or omissions of fact.

> 3.    Recording: At the government's option, the proffer interview may be tape-recorded, videotaped, or recorded through an agent's or government attorney's handwritten notes.

[4.      Polygraph examination requirement, which apparently was struck from letter and initialed and, thus, inapplicable.]

5.      No promises:  While your client hopes to receive some benefit by cooperating with the government, your client expressly understands that the government is making no promise of any consideration at this time.

6.      No direct use:  The government agrees that statements or information contained in your client's proffer may not be used in the government's case-in-chief against your client should a trial be held.   This provision does not apply to any statement made by your client regarding crimes of violence pursuant to paragraph 11 of this agreement.

7.      Impeachment:  If your client should testify materially contrary to the substance of the proffer, or otherwise present in a legal proceeding a position materially inconsistent with the proffer, the proffer may be used against your client as impeachment or rebuttal evidence, or as the basis for a prosecution for perjury or false statement.

8.      Derivative Use:   The government may make derivative use of, and may pursue investigative leads suggested by, any statements or information provided by your client's proffer.  This provision is necessary to eliminate the necessity of a Kastigar hearing wherein the government would have had to prove that the evidence it sought to introduce at trial or in a related legal proceeding is derived from "a legitimate source wholly independent" of statements or information from the proffer.  Furthermore, by signing this document, you and your client waive any hearing pursuant to Kastigar v. United States, 406 U.S. 441 (1972).

9.      Sentencing Information:  Your client understands that if he becomes an indicted defendant, the government, pursuant to 18 U.S.C. Section 3661, must provide to the client's sentencing judge the contents of the proffer. Pursuant to U.S.S.G. Section 1B1.8, however, the proffer may not be used to determine the appropriate guideline sentence, except as stated in the "Impeachment" paragraph above.

10.    Brady Discovery:  Your client understands that Brady v. Maryland and its progeny require that the government provide any other indicted defendant all information known to the government which tends to mitigate or negate such defendant's guilt.  Should your client's proffer contain Brady material, the government will be required to disclose this information to the appropriate defendant(s).

11.    Crimes of Violence:  Any statements made by your client concerning any crime of violence may be used against your client directly or indirectly.

12.    Full Agreement:  This document constitutes the full and complete agreement of the parties.

The Court determined that "the government has not breached the proffer agreement simply by presenting to the grand jury and including the false statement counts in the superseding and second superseding indictment[;] the government did not need to seek the Court's advance permission to *charge* Mr. Arata." See Hoffman, 2014 WL 5040721, at *6 (emphasis added).  Nevertheless, the Court noted that the parties' submissions and, thus, the Court's ruling left outstanding "an obvious unresolved issue that must be dealt with, pre-trial[:] whether or not Mr. Arata materially breached an agreement with the government such that the government is absolved of any of its obligations under the proffer agreement." Id.  The government now seeks a judicial determination that Mr. Arata breached the proffer agreement; the government requests that the Court vitiate the proffer agreement so that the government may be absolved from its conditional promise not to use his proffer statements in its case-in-chief.   Mr. Arata opposes the

11

government's request with respect to the proffer agreement, and he also seeks to dismiss Counts 1 through 21 of the second superseding indictment or, alternatively, he seeks severance on the ground that joinder is prejudicial because he withdrew from the alleged conspiracy in August 2009.

I.

Motion to Vitate Proffer Agreement

*A.*

1.  Legal Standard: Material Breach by a Preponderance of the Evidence

The parties agree that the procedure articulated in this Court's October 8, 2014 Order and Reasons applies to the government's request for a judicial determination that Mr. Arata breached the proffer agreement.  See United States v. Hoffman, No. 14-22, 2014 WL 5040721, at *3 (E.D.La. October 8, 2014).  That is:

> [W]hen the government takes the position that a criminal defendant has breached an agreement such as a non-prosecution agreement[,] a special procedure is triggered[.]  United States v. Castaneda, 162 F.3d 832, 835 (5th Cir. 1998)[.]  Notably, the focus is on the materiality of the defendant's alleged breach, and the burden of proof rests with the government[.]

> When the government believes that a defendant has breached the terms of a nonprosecution agreement and wishes to be relieved of performing its part of the bargain ... due process [requires that] **the government must prove to the court by a preponderance of the evidence that (1) the defendant breached the agreement, and (2) the breach is sufficiently material to warrant rescission.** If the pleadings show no factual dispute, the court may determine breach as a matter of law.

Castaneda, 162 F.3d at 836.

12

Hoffman, 2014 WL 5040721, at *3 (emphasis added).  Materiality is defined as a statement having "a natural tendency to influence, or [being] capable of influencing, a decision of the decision making body to which it is addressed."  United States v. Gaudin, 515 U.S. 506, 509 (1995).

    2.   Standard for conducting an evidentiary hearing

The government submits that it is within the Court's discretion to hold an evidentiary hearing but that the Court need not hold one here, where the undisputed facts suffice to show that it is more likely than not that Arata made a material misstatement at the proffer.  In other words, the government urges the Court to put aside any factual dispute and consider only the undisputed factual record on the papers.

The defendant counters that, if the Court is inclined to grant the government's motion, he is entitled to a hearing and to call certain witnesses to develop the record.  What is now an incomplete record.  The Court finds that the process calls for a limited evidentiary hearing.  Of particular concern is whether an evidentiary record consisting entirely of unauthenticated evidence is a sufficient record starting point for determining the threshold issue: whether a defendant materially breached a proffer agreement.

Although the case literature suggests, as the government points out, "[i]f the pleadings show no factual dispute, the court may determine breach as a matter of law", that seems directed

toward "pleadings" and not documentary evidentiary submissions. <u>See</u> <u>Castaneda</u>, 162 F.3d at 836.   The process endorsed by the case literature contemplates an evidentiary hearing where, as here, the Court is directed to consider documentary evidence and there are some disputes about the submissions as well as the scope of the record.

*B.*

The Court turns to consider the parties' arguments and the evidence that places the arguments in context.  The government focuses on what it considers to be four material misrepresentations made by Arata during the proffer.   The source of these purported misrepresentations is Government Exhibit A, the FBI 302 summarizing the proffer meeting. The government submits that it has shown by at least a preponderance of the evidence that Arata knowingly made at least one material false statement sufficient to vitiate the entire proffer agreement.

*The Government's Arguments*

The government submits that Arata was debriefed on the eve of indictment to give him a final opportunity to tell his side of the story; but he gave false statements in an attempt to influence the government's decision whether to present an indictment against him. The parties agree that Arata's FBI 302 is an accurate representation of Arata's statements during his debriefing.   In light of the documentary evidence, the government contends that it

14

has shown by a preponderance of the evidence that Arata knowingly made at least one material false statement sufficient to vitiate the entire proffer agreement.

Placing in context the evidence it submits as to each of Arata's alleged false statements, the government addresses Counts 22 and 23 first, followed by Count 24, and finally considers Count 25.

*Counts 22 and 23: Termination of Arata's relationship with Peter Hoffman and submission of legal fees to the State*

The government first submits that, in an attempt to distance himself from Hoffman, Arata **falsely stated** during the proffer that **"he terminated his relationship with Peter Hoffman in or about July 2009."** Although the government concedes that the record establishes that Hoffman and Arata had a falling out in the beginning of August 2009, the government submits that they reconciled in time to file the second application with the State.  As support, the government points to emails dated November 2009 between Hoffman and Arata.

Among the fictitious expenditures included in the January 20, 2010 application were hundreds of thousands of dollars in bogus legal fees for Peter Hoffman and Arata.  Arata admitted during his proffer that the legal fees were bogus, but the government charges that he **falsely stated** that **"he was not aware that the [] legal fees were submitted to the State for tax credits."**

15

The government then takes the Court through the many exhibits it has submitted: "When reviewed in sequence," the government submits, "these items prove by a preponderance of the evidence that Arata lied during the proffer about the termination of his relationship with Peter Hoffman in July 2009 and also lied about his knowledge of, and involvement in, the submission of bogus legal fees to the State for tax credits after July 2009." The government submits this documentary evidence:  Exhibit D (November 12, 2009 emails between Arata and Hoffman), Exhibit E (December 21, 2009 email between Arata and his business partner, Jerry Daigle), Exhibit F (December 23, 2009 email from auditor Katie Kuchler to Arata attaching legal fee invoices), Exhibit G (December 24, 2009 email from Arata to Daigle), Exhibit H (December 28, 2009 email between Arata and Kuchler), Exhibit I (December 29, 2009 emails between Kuchler and Hoffman regarding proof of claimed expenditures), Exhibits J & K (December 31, 2009 emails from Arata to Kuchler supplying equity interest and ownership proof; proof of his ownership interest in SAPLA supported Hoffman's claim that Arata's legal fees were paid by increasing Arata's equity interest in SAPLA), Exhibit L (December 30-31, 2009 emails between Seven Arts in-house accountant, Marcia Matthews, Hoffman, and Arata), Exhibits M, N & O (January 7-8, 2010 emails between Kuchler and Hoffman regarding legal fees), Exhibit P (January 12, 2010 email from Hoffman to Arata), Exhibit Q (January 12, 2010 email from

16

Arata to Kuchler in which Arata emailed to Kuchler the executed SAFELA operating agreement evidencing Voodoo's 40% interest in SAFELA), Exhibit R (January 20, 2010 Seven Arts 807 infrastructure project application filed with the State, which includes $350,000 in legal fees), Exhibit S (April 13, 2010 email between Hoffman and Arata and May 14, 2010 email between Hoffman and auditor John Theriot (with Arata, Kuchler, and others copied on the email) regarding auditor's withdrawal of audit reports).

These exhibits show, the government argues, that Arata made materially false statements regarding (a) terminating his relationship with Peter Hoffman in July 2009 and (b) his knowledge regarding the submission of the legal fees in the 2010 tax credit application; that after July 2009, Arata personally assisted in completing the January 20, 2010 application by helping to convince the auditor to include the bogus legal fees in the audit report and by reviewing the Hoffmans' affidavits which claimed thousands of hours of "supervisory" work that was submitted as expenditures to the State. Also, 10 months after the alleged termination of the relationship, that Arata still worked with Hoffman after the State uncovered some fraudulently claimed expenditures and the auditors withdrew their reports. And finally, contrary to Arata's claim to government investigators during his proffer, that Arata continued his relationship with Peter Hoffman on film-related projects at least until 2011. (Here, the government cites Exhibit T in

17

support; Exhibit T is a January 4, 2011 email from Hoffman to Arata attaching a Loan and Security agreement for the film, *Booty Patrol*).

*Count 24: The Film Equipment*

During the proffer, Arata was questioned regarding the claimed purchase of $1,027,090 in film equipment from Departure Studios in California. **Arata stated that the film equipment had been "acquired" in that the equipment would be contributed to 807 Esplanade by the vendor as a business partner and that he did not think the equipment had been "purchased" or "paid for."** It is the government's contention that this statement is **materially false**, and was intended to mislead the FBI with regard to Arata's intent. That to this day, no film equipment has been contributed by Departure and no partnership with Departure has commenced.

Turning to the evidence, the government argues that the documents show that Arata tried to mislead the auditors and the State into believing that the equipment had been purchased and paid for. The misrepresentations in the documentary evidence are inconsistent with Arata's proffered claims of a business contribution and in fact prove that Arata knew the equipment had not been acquired in any manner. The government directs the Court to Exhibit U (November 19, 2008 email from Seven Arts employee to Arata, attaching both sides of Departure Studios circular transactions; and Arata email explaining that Seven Arts "has no

'sale' contract for the equipment [but that] bank statements will evidence the payments"), Exhibit V (December 1, 2008 email from Arata to auditor in which Arata sends to the auditor only the outgoing "payment" side of the circular transaction, which the government contends created the illusion that SAPL had divested itself of $1,027,090 and paid Departure Studios; although he had the other side of the wire transfer as well, Exhibit U, Arata submitted only the "payment" side), Exhibit W (May 14, 2009 email from Arata to State and auditor attaching an invoice as proof of payment for Departure equipment), Exhibit X (Seven Arts Pictures Louisiana bank account statement, showing that on October 3, 2008, SAPL received $400,000 in cash from Arata's company Leap Film Fund; after the wire transfers in Exhibit U had the money bouncing back and forth between SAPL and Departure Studios to create the appearance of payments for the $1,027,090 in equipment, on October 7, 2008, the $400,000 inserted by Arata was withdrawn and sent back to Leap Film Funds, after the circular transactions were complete).

The government submits that this evidence shows that Arata knew that the equipment had not been "acquired" or "contributed"; in fact, the equipment had not been obtained in any manner. Arata's knowledge of the truth is shown by his providing bank transfer records, invoices and signed payment receipts to create an illusion that the film equipment had been paid for and purchased from a "vendor." Arata's false statement was intended to mislead

19

the government into believing that Arata did not intend to defraud the auditor or the State with regard to the film equipment; but the government says the evidence shows that is what he did.

*Count 25: Disclosure of Circular Transactions*

Finally, the government submits that **Arata falsely represented at the proffer that he "thought he fully disclosed both sides of the transactions for construction and equipment expenditures."** In fact, the government contends, Arata knew that he had purposefully culled out the back end of the circular transactions to mislead the auditors and the State.

Turning again to Exhibit W, as well as Exhibit X, on October 3, 2008, Arata initiated circular transfers at Regions Bank by inserting $400,000 to be bounced back and forth in between bank accounts controlled by the defendants.  And Exhibit U shows that on November 19, 2008 Arata received copies of both sides of the Regions Bank wire transfers for equipment and construction; but on December 1, 2008, Exhibit V shows, Arata deliberately withheld from the auditor the back half of the circular transactions related to film equipment.  And, the next day, on December 2, 2008, Exhibit Y shows that Arata purposefully withheld from the auditor the back half of the circular transactions related to construction.  Exhibit W shows that Arata signed and submitted fraudulent payment receipt certifications for construction and film equipment.

The government submits that it is clear that Arata knew that he was not fully disclosing both sides of the circular transactions to the auditors.   He acted deliberately with an intention to falsify to make it appear that certain items had been paid for so that tax credits could be claimed; tax credits to which he would not otherwise be entitled.

The government emphasizes that Arata does not dispute that he made the statements charged in the second superseding indictment; he does not dispute the accuracy of the FBI's account of those statements; he not dispute the accuracy of the documentary evidence presented by the government.   Arata only disputes the inferences and conclusions to be drawn from the evidence. The government submits that there is no need for additional evidence. But the complexity of the government's submissions contradicts the argument that an evidentiary hearing is unnecessary.

*Arata's Opposition*

The government's submission, Arata correctly urges, is insufficient to carry its burden of proof, considering that it submits a series of emails, several of which do not include what he claims is the full story (Exhibits I, M, N, and O); two emails that were submitted to an auditing firm which did not prepare a tax credit application (Exhibits V and Y); and, finally, he insists virtually every email is rife with hearsay.   Arata counters that the emails selected by the government (to the extent they are even

21

relevant) do not set forth all the facts and that many of the government's factual assertions are contradicted by other excluded emails.[8]

Moreover, Arata submits, that because of the factual questions that confront this motion, the government cannot carry its burden on the papers alone and an evidentiary hearing is necessary to develop a complete and accurate record.  The Court agrees.  But denial of this motion seems premature and an evidentiary hearing at which Arata would specifically call Jerry Daigle, Katie Kuchler-Davis, Marcia Matthews, Chris Stelly, Katherine Dodge, Stephanie Dillon, and Melissa Oelking seems abundantly appropriate in order to serve Mr. Arata's rights.

First, he submits that he told the truth when he stated that he terminated his relationship with Peter Hoffman in or about July 2009.  Arata explained during the proffer session that he sent this "nice guy" letter instead of a harsher one because he had to continue dealing with Hoffman in order to unwind their business relationship.[9]  Government Exhibit D  (11/12/09 email) does not

---

[8]Although the government says that Arata lied at the proffer in order to influence the government's decision regarding whether to indict him, arguably the facts show that before the proffer session even began, the government already knew Arata's statements on virtually all of the issues through prior meetings with Arata and other documents he provided.  See United States v. Castaneda, 162 F.2d 832 (5th Cir. 1998).

[9](Voodoo Studios, LLC, a company owned by Advantage Capital, Mr. Arata, and another individual investor, had a 40% interest in the 807 Esplanade project.  Advantage Capital had loaned $3.7

support an inference of reconciliation but, rather, refers to an "amicable settlement" between adverse parties; it is also a communication made by Arata and Jerry Daigle as representatives of Voodoo Studios, not by Arata as an agent for Hoffman's businesses. Nor does Government Exhibit L (12/31/09 email) support an inference of reconciliation. All this email shows is that Arata agreed to provide hotel bills and car rental invoices for a film, *Night of the Demons*, to Seven Arts' bookkeeper, Marcia Matthews. Arata's termination letter specifically references *Night of the Demons* and states that "I will, as I indicated to you yesterday, go through bank statements with Marcia to make sure that she has specific backup for what has been paid up to date." (Govt. Ex. C). Thus, Exhibit L is, in fact, entirely consistent with Arata's explanation to the government.

Second, Arata protests that he told the truth when he stated that he did not know that $250,000 in legal fees had been submitted

---

million to the project and could not simply walk away.).

At the same time he sent the termination letter, Arata informed the State that the audit supporting the tax credit application was being withdrawn and that he was no longer representing SAPL. Hoffman then removed Arata from the SAPL bank account and notified the state that SAPL had retained new counsel for its tax credit application.

Arata's position on this termination issue has always been consistent. In April 2012, almost two years before the indictment, Arata sent an email to the state explaining that he had informed them several times since mid-2009 that he does not represent Seven Arts, and that he will not forward communications to the proper party: "Indeed, I am adverse to Seven Arts in this matter and others that you may be aware of."

to the state.  He contends that, in fact, the government cannot provide any evidence that Arata ever saw the January 2010 tax credit application or had any knowledge regarding what was included in it.

The emails submitted by the government arguably do not prove that Arata knew that Hoffman included legal fees in a subsequent tax credit application.  At most, the emails might equally suggest that Arata was aware that Hoffman was attempting to include these fees and that Arata disagreed with that attempt. As several emails indicate (Government Ex. G and H), Arata complained about Hoffman's bogus invoices to Voodoo partner Jerry Daigle ("he submitted this to [auditor] Katie [Kuchler-Davis] without my approval"), and ridiculed the invoices to Ms. Kuchler-Davis ("the New Orleans, California bill?").  The government apparently overlooks that, in his proffer, Arata explained that "Arata talked to [Kuchler-]Davis on the phone and told her that he did not submit the legal invoices to Seven Arts. Arata told Davis that the fees were not his legal fees."

And, Arata submits that his statements are consistent with Ms. Davis' January 7, 2010 email to Hoffman that "Michael states that he did not receive the money for which you are billing a company he has no interest in, so I am taking out his hours and fees of $203,637.50." (Arata Ex. 6).  This could be entirely consistent with what Arata said during the proffer: that he "called [Seven

Arts employee Stephanie] Dillon and told her not to submit the invoices to the auditors, and said that he had not received payment, had not billed for the hours and had not discussed being owed legal fees." Instead of being directed to Arata's knowledge of the legal fee issue, most of the government's email exhibits consist of *Hoffman* trying to convince Kuchler-Davis to include Arata's legal fees (Govt. Ex. I, M, N, and O). The only emails between Arata and Kuchler-Davis contain copies of various corporate documents, and these emails make no reference to legal fees. (Govt. Ex. J, K, and Q). On their face, Arata takes the position that these emails support neither the government's conclusion that these emails were part of an attempt by Arata to include invalid legal expenses in a tax credit application, nor do they support the government's inference that Arata and Hoffman reconciled or that Arata returned to active involvement in the 807 Esplanade project. Perhaps most importantly, the record focuses no evidence on the ultimate issue: that Arata ever even saw the January 2010 tax credit application or had any idea what was contained in it.

Third, Arata submits that he truthfully stated that he believed Departure Studios contributed film production equipment to Seven Arts as a business partner. The government argues that Arata lied when he stated he "thought Seven Arts 'acquired' the equipment in that Seven Arts agreed with [Departure Studios owner Damon] Martin that he would contribute the equipment as part of being a

25

business partner and did not think Seven Arts purchased or paid for the equipment." This explanation, he insists, was entirely correct. At the proffer session, Arata explained that Departure Studios and its owner were intended to be co-venturers in SAPL. Consistent with this, SAPL's business plan states that Departure Studios would be a managing member of the business and that Damon Martin would be part of the management team. (Arata Ex. 7). In addition, SAPL's Infrastructure Application made clear that Departure Studios would be a partner in the project. (Ex. 8). And Mr. Martin himself confirmed to the FBI that Peter Hoffman told him he was going to get a 25% stake in the business. (Ex. 9). Hoffman himself executed an affidavit on November 6, 2008 in which he stated that "Departure Studios will act an [sic] agent and co-venturer with Seven Arts in the operation of a post-production sound facility at 807 Esplanade, and it has confirmed the existence of this equipment...." (Ex. 10). Hoffman also stated that Departure's equipment was "acquired by Seven Arts for use in its facility at 807 Esplanade in New Orleans, Louisiana which equipment will be delivered to 807 Esplanade upon completion of construction of the facilities at that location."

Finally, Arata submits that he truthfully stated that he thought he fully disclosed to the auditors the "circular transactions" for construction and equipment expenditures. The government contends that Arata lied when he said that he thought he

fully disclosed the circular transactions. Arata stated in his proffer that "he thought he showed the auditors both sides of the transaction, which would have revealed the circular nature of the transaction." The four exhibits submitted by the government, purporting to prove that Arata did not disclose these transactions to the auditors, do not begin to explain the relationship between SAPL and its auditors and the extent of the disclosures made. In fact, noticeably absent from the government's evidence is any communications on this issue between Arata and Kuchler-Davis, the accountant from Malcolm Dienes, LLC, the firm that actually prepared the SAPL audits that were submitted to the state.[10]

*The Government's Reply*

The government submits that the following issues remain undisputed even in the face of Arata's opposition and accompanying submission. The government counters:

---

[10]To give the Court an idea as to how incomplete a picture the government is offering, Arata submits: Malcolm Dienes, LLC, the auditing firm that employed Kuchler-Davis and prepared the first two tax credit applications submitted to the state, produced to the grand jury its entire file related to the defendants -- that file includes more than 11,000 pages and, notably, that file contained the October 2008 bank statement that the government contends showed the circular transactions. Based on this alone, he says, the government cannot prove that Arata failed to disclose both sides of the transactions. To even attempt to prove what was or was not disclosed to the auditors, he appealingly argues, would require an evidentiary hearing at which Dodge and Kuchler-Davis would be called to testify.

**1.   It is undisputed that Arata continued working with Peter Hoffman after the August 6, 2009 termination letter:**

(a) Arata concedes that he "stayed on with Seven Arts ... because he knew he would not get his money back related to [the] project if he walked away."  The government submits that this is inconsistent with an August 6, 2009 permanent and public withdrawal.

(b) Arata does not dispute or address his statement to Hoffman on November 12, 2009: "we both have the expectation that the relationship will continue to our mutual personal and professional benefit, on 807 and any other projects you may have."  Ex. D. Arata addresses the "amicable settlement" language, but completely ignores this clear statement of reconciliation and future collaboration.

(c)   Arata does not dispute or address the affidavits he reviewed for the Hoffmans on December 31, 2009.  Ex. L.  Arata's opposition addresses only an unrelated part of this email; he completely ignores the 807 Esplanade affidavits attached to this email for his review.

(d) Arata does not dispute or address the fact that he assisted the Hoffmans 8 months after the August 6, 2009 letter when the auditors decided to withdraw the first two audit reports. Govt. Ex. S and Ex. A to Arata's motion to dismiss for prejudicial joinder.

(e)   Arata does not dispute or address the January 4, 2011 review of a Loan and Security Agreement for the Seven Arts film *Booty Patrol*.  Ex. T.

**2.  Arata does not dispute the facts regarding the submission of the legal fees.**

(a) Arata does not dispute that his involvement with legal fees occurred after his 8/6/09 withdrawal.

(b) It is undisputed that "Mr. Arata was aware that Mr. Hoffman was attempting to include [legal] fees...."

(c) It is undisputed that Arata and Jerry Daigle joked about the legitimacy of the legal fees on 12/24/09.

(d) It is undisputed that Arata initially told the auditor on 1/7/10 that "he did not receive the money for which [Hoffman was] billing a company [Arata] has no interest in..." and that the auditor then decided on "taking out [Arata's] hours and fees...." Ex. M.

(e)   Arata does not dispute or address the fact that later that same day he and Peter Hoffman discussed and agreed on legal fees being compensated by ownership interest in the related companies.  Ex. N.

(f) Arata does not dispute or address that he "confirmed the hours" to the auditor the very next day on 1/8/14, after Arata and Hoffman agreed on how the legal fees were being compensated.  Ex. O.

(g) Arata does not dispute or address Hoffman's 1/12/10 email that followed Arata's confirmation of the hours: "Please send the email to [the auditor] ASAP so that she doesn't get any more suspicious than she already is...."  Ex. P.[11]

(h) Arata does not dispute or address the fact that one and a half hours after Hoffman's email, Arata sent the ownership interest records to the auditor, stating "We hope this helps you and Peter wrap up the SAPL audit."  Ex. Q.

(i)  Arata does not dispute or address the fact that he then assisted and advised the Hoffmans four months later when the auditor decided to withdraw the audits.  Govt. Ex. S and Ex. A. to Government's Opposition to Arata's motion to dismiss.

Although Arata initially denied the legal fees because he was not paid cash, this evidence shows by a preponderance that he later acquiesced when Hoffman convinced him to support the legal fees by claiming he was paid with interest in the related companies.

**3.   Arata does not dispute the facts regarding the Departure Studios film equipment.**

(a)  Arata does not dispute or address the fact that he repeatedly told the auditors and the State that the equipment had been purchased from a vendor, not contributed by a business partner.  Ex. U, V, and W.

---

[11]This Exhibit, in isolation, could indeed be damaging to Arata's assertions, but, all the more focuses this Court's belief in the need for a limited evidentiary hearing.

(b) Arata does not dispute or address the fact that he conducted circuitous transfers of funds to make it appear as if the equipment had been purchased and paid for, not contributed by a business partner.  Ex. U, V, and X.

(c) Arata does not address or dispute the fact that, to this day, no film equipment has been contributed by Departure Films and that no partnership with Departure ever commenced.

The government submits that it satisfied its preponderance burden that Arata knew that the film equipment had not been contributed to the 807 project but that he had flatly told the auditors and the State that it had been purchased from a vendor. That he intended to mislead the government into believing that he did not intend to defraud the auditor or the State with regard to the film equipment.

## 4.  The undisputed facts show that Arata knew he was not disclosing the full nature of the circular transactions for equipment and construction.

In his proffer, Arata claimed that he thought he showed the auditors both sides of the circular transactions.  The government contends that the following is undisputed:

(a) The government provided two examples of Arata culling out portions of the circular transactions in his submissions to auditors to make it appear that equipment had been paid for when in fact it had not. Ex. U, V and Y.  And the government submitted copies of affidavits signed by Arata certifying "payment" for

equipment and construction.  Ex. W.  Neither affidavit mentions that the vendors had not been paid and that the money had been returned to the originating account minutes after the withdrawal.

(b) Arata conducted the circular transfers.

(c) Arata only showed the front half of the circular transactions to the auditors and to the State.

The government submits that this shows by a preponderance that Arata intended to mislead the FBI with regard to his disclosing only the payment side of the circular transactions to the auditors and to the State.

*C.*

Finally, the Court turns to analyze the merits of the evidentiary dimension of the parties' dispute as to material breach.  The government agreed to not use in its case-in-chief against Arata any statements or information contained in his proffer.  In exchange, Arata agreed to be "completely truthful."

2.    Truth: Your client's proffer must be completely truthful with no material misstatements or omissions of fact.

Has the government proven by a preponderance of the evidence that Arata materially breached his promise to "be completely truthful"? On this complex and extensive record the Court believes that the answer is "perhaps" but out of caution the Court prefers to hold an evidentiary hearing to give Arata an opportunity to put on evidence of his side of the story and call the witnesses he

represents can serve his contentions.   On the other hand, if the government at such hearing establishes even one material misrepresentation, its motion will be granted:

1.  Did Arata misrepresent terminating his relationship with Hoffman in July 2009?

2.  Did Arata make a material representation when he stated that he did not know that legal fees were submitted for tax credits?

3.  Did Arata make a material misrepresentation when he stated that the film equipment from Departure Studios had been "acquired" in that the equipment would be contributed to 807 Esplanade by the vendor as a business partner and that he did not think the equipment had been "purchased" or "paid for"?

4.  And finally, did Arata make a material misrepresentation when he stated that he "thought he fully disclosed both sides of the transactions for construction and equipment expenditures"?

Resolution of these issues will be submitted and deferred pending the evidentiary hearing requested by Arata, which will be held on Wednesday, January 7, 2015 at 10:30 a.m.

II.

Motion to Dismiss -- Prejudicial Joinder

Mr. Arata claims he withdrew from any alleged conspiracy on August 6, 2009, well before the submission of the second and third tax credit applications; thus, any evidence submitted at trial concerning post-withdrawal conduct will prejudice him. Accordingly, he seeks relief under Rule 14(a) of the Federal Rules of Criminal Procedure, for prejudicial joinder, which he says requires dismissal or severance.[12]   The Court first considers whether there was misjoinder under Rule 8(b) before it reaches whether Arata will be nonetheless prejudiced by the joinder such that relief under Rule 14 is warranted.

*A.*

In considering a defendant's request for relief under Rule 14 of the Federal Rules of Criminal Procedure, the Court first considers whether joinder was proper under Rule 8.   Where an indictment charges multiple defendants and multiple counts, Rule 8(b) of the Federal Rules of Criminal Procedure governs the appropriateness of joinder.   Rule 8 states:

---

[12]Mr. Arata requests that the Court dismiss Counts 1 through 21 of the second superseding indictment as against him on the ground that the prejudice from all of the Overt Acts, substantive counts, and evidence that will be presented, which follow the first application for film tax credits, will have a prejudicial spillover effect.   In the alternative, Mr. Arata requests that the Court sever the trial of Mr. Arata and limit his trial to Overt Acts and Counts that pre-date August 6, 2009.

34

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed.R.Crim.P. 8(b).  The plain text of the Rule permits defendants to be joined if they are charged with participating in the same series of acts or transactions, and they need not be charged together in each count for joinder to be proper.  See id.  "What is required [to properly join defendants or charges] is a series of acts unified by some 'substantial identity of facts or participants.'"  United States v. McCrae, 702 F.3d 806, 821 (5th Cir. 2012)(citations omitted).  This nexus is ordinarily satisfied when an indictment charges an overarching conspiracy that encompasses the substantive offenses charged.  See United States v. Lane, 735 F.2d 799, 805 (5th Cir. 1984), aff'd in part and rev'd in part on other grounds, 474 U.S. 438 (1986). "Whether joinder is proper is normally determined from the allegations in the indictment." McCrae, 702 F.3d at 820(citations omitted); see also United States v. Kaufman, 858 F.2d 994, 1003 (5th Cir. 1998)("The propriety of Rule 8 joinder is determined by the initial allegations of the indictment, which, barring arguments of prosecutorial misconduct, are accepted as true.").

Turning to the allegations in the second superseding indictment, considering the conspiracy, wire and mail fraud

allegations, the government charges a series of acts unified by substantial identity of facts. For this reason, the Court is satisfied that the defendants and charges are properly joined under Rule 8.  Mr. Arata does not seriously advance a misjoinder argument *per se*; rather, the parties' quarrel centers on whether Arata is *prejudiced* by his joinder in light of his submission that he withdrew from any conspiracy early on in August 2009.

A claim of prejudice resulting from joinder triggers Rule 14. The Court turns to whether Mr. Arata has demonstrated entitlement to Rule 14 relief.

*B.*

Recognizing that joinder might in some cases prejudice a defendant, or even the government, Rule 14(a) of the Federal Rules of Criminal Procedure invests the Court with the discretion to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed.R.Crim.P. 14(a).  When defendants are indicted together, joint trials are favored, because "[t]hey promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  Zafiro v. United States, 506 U.S. 534, 537 (1993) (internal quotation marks and citation omitted).  This is especially true when, as here, a conspiracy is charged.  See United States v. Perez, 489 F.2d 51, 65 (5th Cir. 1973).

Given the efficiencies undergirding and the judicial system's preference for joint trials of defendants indicted together, a defendant "must overcome significant obstacles" to prevail on a request to sever his trial from that of his co-defendants.  See McRae, 702 F.3d at 821.  That is, once properly joined in an indictment, a defendant must show "specific and compelling prejudice" to be entitled to severance of a joint trial.  United States v. Krenning, 93 F.3d 1257, 1267 (5th Cir. 1996).  A severance is appropriate under Rule 14 only where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 539.  Severance could be appropriate, for example, where evidence that is probative of one defendant's guilt but inadmissible against another defendant presents a risk of prejudice.  Id.  Severance should not be granted where less drastic measures, such as curative jury instructions, will suffice.  Id.  Finally, the Court notes that motions to sever are rarely granted, and a decision to deny such a motion will be reviewed on appeal only for abuse of discretion. Perez, 489 F.2d at 65.

*C.*

Mr. Arata seeks a dismissal of Counts 1 through 21 against him or, alternatively, seeks severance.  In support of his story that he withdrew from any conspiracy on August 6, 2009, he submits

37

evidence that: he sent a letter dated August 6, 2009 to Mr. Hoffman terminating their business relationship; he notified other Seven Arts officers and others of his resignation; he advised the State that he had withdrawn from his representation of Seven Arts and Peter Hoffman; he abandoned his ownership interest in Seven Arts; he met with government agents and lawyers, cooperated and provided them with documents and participated in interviews; and he reminded the State of Louisiana Film Office that he had withdrawn from representing Seven Arts and that he was adverse to it. His withdrawal from the conspiracy, he maintains, bolsters his contention that the spillover effect from the evidence that will be presented in connection with his co-defendants would deny him a fair trial. The government counters that nothing in the charges or the factual submission by Arata resembles those rare instances in which joinder has been found to be prejudicial. The government contends that Arata has not cleared the hurdles he must clear to show prejudicial joinder. The Court agrees.

"Upon joining a criminal conspiracy, a defendant's membership in the ongoing unlawful scheme continues until he withdraws." Smith v. United States, 133 S. Ct. 714, 717 (2013). In motion practice under Rule 14, the defendant bears the burden of demonstrating withdrawal, "of demonstrating that he has committed affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach

conspirators." <u>United States v. Puig-Infante</u>, 19 F.3d 929, 945 (5th Cir. 1994)(internal quotation marks and citations omitted).  Fifth Circuit Pattern Instruction 2.23 captures these legal principles and is helpful:

**2.23**
**CONSPIRACY – WITHDRAWAL**

The defendant has raised the affirmative defense of withdrawal from the conspiracy.

A member of a conspiracy remains in the conspiracy unless he can show that at some point he completely withdrew from the conspiracy.  A partial or temporary withdrawal is not sufficient.  The defense of withdrawal requires the defendant to make a substantial showing that he took some affirmative step to terminate or abandon his participation in the conspiracy.  In other words, the defendant must demonstrate some type of affirmative action that disavowed or defeated the purpose of the conspiracy.  This would include, for example, voluntarily going to the police or other law enforcement officials and telling them about the plan; telling the other conspirators that he did not want to have anything more to do with it; or any other affirmative acts that were inconsistent with the object of the conspiracy and communicated in a way reasonably likely to reach the other members.  Merely doing nothing or just avoiding contact with other members is not enough.

The defendant has the burden of proving withdrawal from the conspiracy by a preponderance of the evidence.  To prove something by a preponderance of the evidence means to prove that it is more likely so than not so.  This is a lesser burden of proof than to prove something beyond a reasonable doubt. "Preponderance of the evidence" is determined by considering all the evidence and deciding what evidence is more convincing.  You should consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.  If the evidence appears to be equally balanced, or if you cannot say upon which side it weighs heavier, you must resolve the question against the defendant.

39

> The fact that the defendant has raised this defense, however, does not relief the government of its initial burden of proving beyond a reasonable doubt that there was an unlawful agreement and that the defendant knowingly and voluntarily joined it.

Although there is certainly some support in the record for Arata's affirmative defense of withdrawal, this is an issue that patently turns on factual controversies,[13] which are best deferred to consideration by the jury after development of the record at trial. See United States v. Jimenez, 622 F.2d 753, 755-56 (5th Cir. 1980)). Because Arata's present request for dismissal or severance

---

[13]Indeed, the government disputes this issue of fact by submitting that Arata continued to take actions to advance the conspiracy after he sent Hoffman the August 6, 2009 letter. For his part, Mr. Hoffman filed a response to Arata's motion in which he alerts the Court to his own motions set for hearing in January 2015 and he also, of some interest, takes the position that "Mr. Hoffman fully supports Mr. Arata's assertion that he had nothing to do with the Silva Audit Report and his representation of SAPLA had long since ended when it was prepared and filed in July, 2012" and that "Arata was not involved in any material decisions regarding the second audit report." (Hoffman notes that he separately moves to sever his trial from that of Arata; a motion that is noticed for submission in January 2015).

Complicating matters, the timeliness of Arata's withdrawal is a factor. Distinguishing between timely and untimely withdrawal, the Fifth Circuit instructs that "[a]n untimely withdrawal does not negate liability on the *conspiracy charge,* but instead helps a defendant guard against post-withdrawal acts done by other co-conspirators and thereby serves to minimize his liability on subsequent crimes." United States v. Salazar, 751 F.3d 326, 330-31 (5th Cir. 2014) (citation omitted, emphasis in original). "To be timely, the withdrawal must precede the commission of an overt act." Id. at 331 (citation omitted)(noting that, "[f]or purposes of absolving liability for the conspiracy charge, withdrawal is impossible once an overt act has been committed."). Arata submits that he withdrew from the conspiracy on August 6, 2009. The second superseding indictment charges 15 Overt Acts that are alleged to have occurred before August 6, 2009.

necessarily requires a pre-trial judicial determination of withdrawal, the Court is not persuaded that severance or dismissal is warranted.  Rather, the threshold issue of withdrawal -- an affirmative defense of which in law Arata will bear the burden to prove by a preponderance of the evidence at trial -- must await the fact-finder.  Arata submits nothing to persuade the Court to decide withdrawal as a matter of law such that it could even reach whether this withdrawal creates a danger of prejudice warranting severance, let alone dismissal of Counts 1 through 21.

Nevertheless, putting aside the factual issue of withdrawal, Arata submits that prejudicial joinder warrants dismissal or severance.  Arata invokes United States v. McCrae, 702 F.3d 806 (5th Cir. 2012), where the Fifth Circuit held that a severance was warranted.  The Court is not persuaded.  McRae is distinguishable on its facts.  In McRae, the Fifth Circuit considered the appeals of three New Orleans Police Officers, David Warren, Gregory McRae, and Travis McCabe, tried jointly and convicted for charges related to the death of Henry Glover.  Id. at 810-11.  Warren appealed the district court's denial of his persistent requests to sever.  Id. Warren had been charged with shooting Glover while guarding a police substation in the wake of Hurricane Katrina, while McRae and McCabe were charged with orchestrating a gruesome and elaborate coverup that included burning Glover's body and falsifying a police report after the shooting.  Id. at 821.  The Fifth Circuit

instructed: "[i]t is the rule ... not the exception, that 'persons indicted together should be tried together, especially in conspiracy cases.'"   Id. (citation omitted).   The Fifth Circuit held that Warren's case presented the rare situation warranting severance, and vacated Warren's convictions and sentences and remanded for a new trial.   Id. at 828.[14]   The court reasoned that a "marginal relationship" existed between the charges and evidence against Warren and that against his co-defendants; that a significant difference existed between the simplicity of the underlying charges against Warren and the crimes alleged against his co-defendants; and that the charges and evidence against the co-defendants, from which Warren was disassociated, were highly inflammatory and prejudicial in nature.   Id.

Here, unlike in the case of Officer Warren, the charges and evidence against Arata and his co-defendants are the same; all three are charged with conspiring to commit, committing, and aiding and abetting wire and mail fraud, in violation of 18 U.S.C. §§§ 371, 1343, 1341.[15]   As a result, Arata fails to identify inflammatory or prejudicial evidence that will necessarily be admissible against him at trial that careful jury instructions

_____

[14]Notably, in McCrae, the Fifth Circuit specifically held that the district court did not abuse its discretion in denying Warren's motions to sever urged *before* trial.

[15]The government submits that Hoffman's efforts to defraud the state are no more inflammatory than the charged conduct of Arata, who allegedly compounded his crimes by lying to investigators.

would not cure.   Arata fails to demonstrate that being tried jointly with his co-defendants (indeed, alleged co-conspirators) poses any specific or discrete risk to a trial right, and he likewise fails to persuade at this pre-trial stage that the jury will be unable to reliably judge his guilt or innocence in the context of a joint trial.  See Zafiro, 506 U.S. at 539.  Arata's motion to dismiss or sever is DENIED.[16]

Accordingly, the government's motion to vitiate the proffer agreement is submitted and deferred pending a limited evidentiary hearing.[17] The hearing will be limited to the four misrepresentation issues raised by the government.  Mr. Arata's motion to dismiss or sever is DENIED.

New Orleans, Louisiana, December 18, 2014

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[16]Obviously, given that Mr. Hoffman's motion is noticed for submission in January 2015, the Court does yet not reach the merits of the independent arguments he advances in support of severance. Mr. Hoffman also alludes to what he perceives to be the prejudicial nature of the evidence Arata has submitted in support of Arata's motion to dismiss for prejudicial joinder.  Because Mr. Hoffman has filed separate motions seeking relief, the Court will fully consider Mr. Hoffman's arguments when it reaches his motions.

[17]See United States v. Castaneda, 162 F.3d 832, 836-39 (5th Cir. 1998).